UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KAESER COMPRESSORS, INC.,

        Plaintiff,

v.                                          Case No. 09-C-521

COMPRESSOR & PUMP REPAIR SERVICES, INC.,

        Defendant.

---

**DECISION AND ORDER**

---

Plaintiff Kaeser Compressors, Inc. brought this declaratory judgment action seeking a declaration that it may terminate its dealership relationship with Defendant Compressor & Pump Repair Services, Inc. ("CPR") without compensation. It further asks the Court to declare, in the alternative, that CPR's failure to sign a new dealership agreement constitutes good cause for termination under the Wisconsin Fair Dealership Act ("WFDL"). CPR filed an answer and a counterclaim alleging violations of the WFDL and the duty of good faith and fair dealing, and Kaeser has now moved to dismiss that counterclaim. For the reasons given below, the motion will be denied.

**I. Background**

On October 24, 1988, the parties entered into a dealership agreement under which CPR agreed to represent Kaeser's industrial air compressor products exclusively. According to the allegations in the counterclaim (which are taken as true, for present purposes), CPR became one of Kaeser's top dealerships in the nation, and it expanded its territory throughout Wisconsin and

Minnesota. Despite the fact that CPR was a successful dealership, on July 17, 2008 Kaeser sent CPR a letter informing it that its exclusive status would be terminated if it did not submit a satisfactory business plan within sixty days:

> The purpose of this letter is to advise you that Compressor & Pump Repair Services, Inc. ("CPR") will become a non-exclusive distributor of Kaeser Compressors, Inc. for the products it is authorized to distribute, effective ninety (90) days from the date of your receipt of this letter ("the Effective Date"), unless the deficiency noted below is cured within sixty (60) days of the date of your receipt of this letter ("the Cure Deadline"). From and after the Effective Date, absent timely cure of the deficiency, CPR's right to sell and distribute any Kaeser Compressors, Inc. products will no longer be exclusive. . . . The reason for the change to non-exclusive status effected by this notice is CPR's refusal, despite numerous requests from Kaeser Compressors, Inc., to submit a business plan.

(Answ., Ex. E.)

CPR did submit a business plan in September 2008, but Kaeser was unsatisfied and believed the plan reflected CPR's view that the "status quo" was acceptable. (Answ., Counterclaim ¶ 30.) For its part, CPR suspected that Kaeser was simply looking for some kind of pretext upon which to terminate its dealership, particularly since Kaeser had never required a "business plan" during the parties' twenty-year relationship. CPR's suspicion was all-but confirmed when, after a face-to-face meeting, Kaeser asked CPR to sign a new dealership agreement that would end CPR's exclusive right to sell Kaeser products. (Answ., Ex. J.) The cover letter enclosing the proposed agreement explained that Kaeser believed additional sales could be made in the territory, and thus it wanted to allow itself the right to obtain additional dealers if the need arose. Kaeser's letter reads, in part, as follows:

> I have enclosed with this letter two duplicate originals of an addendum to our distributor agreement, providing that CPR's distribution rights in the territory will henceforth be nonexclusive. This does not mean that we will immediately appoint

an additional distributor for the territory or arrange for additional distribution in some other way, but it does unambiguously recognize our right to do so.

(*Id.*)

CPR refused to agree to the new distributor agreement, and in a November 19, 2008 letter Kaeser expressed its disappointment. (Answ., Ex. L.) It again stated that it would not immediately begin attempting to sign another dealer for the area, but it would explore that option if CPR's sales did not improve:

> Kaeser will defer the decision about additional sales effort in the territory until we see what performance CPR actually achieves. lf CPR fails to achieve satisfactory growth by not meeting the quarterly levels of the attached growth chart for two or more consecutive quarters, its refusal to agree to the contractual change Kaeser requested will, in the event a change becomes necessary, put Kaeser in the position of having to terminate the CPR relationship on 90 days' notice. CPR will be given the opportunity to cure the termination by accepting a non-exclusive agreement within 60 days of the termination notice.

(*Id.*)

In March 2009, CPR learned that Kaeser had begun selling its products directly through Sears stores and the Sears website. Kaeser also informed CPR and other dealers that it would be selling its products directly through its own website. After another meeting, Kaeser told CPR it would have to sign a new distributorship agreement within 20 days. The new agreement would eliminate CPR's exclusivity and contained other conditions to which CPR objected. After CPR refused to sign the agreement, Kaeser brought this declaratory action.

CPR alleges in its counterclaims that the actions described above violated the WFDL, Wis. Stat. § 135.04, because they amounted to a constructive termination without adequate notice. It further alleges that Kaeser violated § 135.03 by changing the competitive circumstances of the dealership without good cause. Finally, it alleges that Kaeser violated the duty of good faith and

3

fair dealing by creating a pretext to terminate the dealership and reap the benefits of CPR's twenty years of creating a market for Kaeser products.

**II. Section 135.03**

The WFDL was enacted in order to protect Wisconsin dealers from the perceived unfairness that results from an inherently unequal bargaining position between the manufacturer (grantor) and the dealer. Wis. Stat. § 135.025(b). Section 135.03 provides that "[n]o grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor." CPR argues that Kaeser substantially changed the competitive circumstances of the dealership agreement when it began selling directly to customers, circumventing CPR's exclusive right to represent Kaeser in its territory.

Kaeser argues that its agreement with CPR was never an exclusive one. As such, the competitive circumstances of the dealership agreement were not changed by Kaeser's use of Sears as a reseller of its products within CPR's territory. First, Kaeser notes that the original 1988 distributor agreement makes no mention of any right to sell exclusively. Although it requires CPR to *sell* exclusively Kaeser products, there is no express requirement that Kaeser itself have only one dealer within its territory. Because exclusivity is a very important component of dealership relationships, Kaeser contends that the absence of such a clause in the agreement is telling. Second, although Kaeser's correspondence threatened to revoke CPR's status as an "exclusive" dealer, Kaeser argues that CPR's exclusivity arose not from contract but from the fact that Kaeser had simply never appointed another dealer for the territory. The letters from Kaeser merely recognize that circumstances had made CPR a *de facto* exclusive dealer and suggest that such circumstance

4

would change if business did not pick up; they were not concessions that CPR had a *right* to exclusivity under the dealership agreement. Because § 135.04 only governs changes to the dealership agreement itself – not the "circumstances" of the business relationship – Kaeser's actions did not violate § 135.04.[1] *Brauman Paper Co. v. Congoleum Corp.,* 563 F. Supp. 1, 3 (D.C. Wis. 1981) ("If the dealership agreement is not exclusive, then [grantor's] appointment of a new dealer will not 'substantially change the competitive circumstances of the dealership agreement.'") (citing Wis. Stat. § 135.03).

*Brauman* and other cases make clear that it is the *agreement* itself that must be changed before there is a violation of §135.03, not merely the competitive circumstances of the relationship. Kaeser argues that because the dealership agreement does not provide for exclusivity, its own selling of products through Sears did not affect the agreement at all – it merely affected the competitive circumstances of that agreement. Under CPR's theory, Kaeser argues, that distinction would be erased because the "circumstances" of the business – i.e., the *de facto* exclusivity of the dealership – would trump what's actually written in the agreement itself. And it is not difficult to imagine dozens of circumstances under which a non-exclusive agreement could "become" exclusive under CPR's theory. For instance, a new manufacturer or a manufacturer venturing into a territory for the first time might initially only sign a single distributor as it dips its toe into the market. The

---

[1] Kaeser makes several arguments about what CPR actually pled in its counterclaim. Although these objections are not without some merit, in deciding a motion to dismiss, the court is required to consider reasonable inferences from all of the facts alleged. Moreover, leave to amend is typically granted quite freely. Accordingly, even if CPR's counterclaim does not precisely track the WFDL (e.g., "CPR's competitive circumstances," as opposed to "competitive circumstances of a dealership agreement"), there would seemingly be no hurdle to an amendment to correct its pleading. It thus makes more sense to proceed to the substantive arguments.

5

relationship might last in a *de facto* exclusive state for several years as the business grows, but that would not change the terms of the agreement.

Here, however, it is not clear that the parties did not intend CPR's dealership to be exclusive from the very beginning, despite their failure to use the word "exclusive" in their letter agreement. The fact that Kaeser agreed that "[a]ll sales leads in your territory, received by Kaeser as a result of our advertising efforts will be forwarded to [CPR]" certainly suggests the intent that CPR's territory would be exclusive. (Answ., Ex. A at 2) Likewise, a provision allowing Kaeser to reassign a portion of CPR's territory to another distributor in the event CPR did not open a sales and service branch in the Milwaukee area by January 1, 1991, implies CPR's dealership was intended to be exclusive. (*Id.*) Further support for CPR's assertion that its dealership was exclusive is provided by the course of dealing between the parties over the last twenty years. CPR in fact operated as the exclusive dealer for that entire period, as well as the absence of any hint to the contrary from Kaeser until last year's correspondence. Moreover, one of the letters from Kaeser notes that the new agreement it proposed would "unambiguously recognize our [Kaeser's] right" to appoint another dealer. (Answ., Ex. J.) If Kaeser *already* had the right to appoint another dealer and render the agreement non-exclusive, CPR wonders, why was it so insistent on getting CPR to sign a new contract with non-exclusivity as its principal provision? Moreover, that same letter refers not just to CPR's *circumstantial* status as an exclusive dealer – it said that if CPR signed the proposed new agreement "CPR's distribution *rights* in the territory will henceforth be nonexclusive." (*Id.*) Thus, it appears that even in Kaeser's mind, CPR was not merely a *de facto* exclusive dealer: its exclusivity was the stuff of "rights."

6

As both sides recognize, an exclusive dealership can arise even when there is no written agreement or when the dealership agreement is silent on the subject. In *Brauman Paper,* the district court found no implied exclusivity agreement because there was evidence that other dealers operated in the allegedly exclusive territory and the dealer had no credible evidence that its territory was exclusive. 563 F. Supp. at 3. And although there was a written dealership agreement, that agreement was apparently silent on the exclusivity issue as well. *Id*. Although the district court ruled against the dealer, the implicit premise of the ruling was that the conduct of the parties during the dealership *could* create exclusivity – even when there was a written dealership agreement that was (as here) silent on the issue. In other words, with better facts the dealer in *Brauman* could have won.

In *California Wine Ass'n v. Wisconsin Liquor Co. of Oshkosh,* the Wisconsin Supreme Court explained how an exclusive relationship could arise:

> From 1945 until February, 1959, the Peckarsky Companies were the only distributors of the Association, and with respect to Aristocrat brandy, they promoted and sold it to the virtual exclusion of other brandy handled. In their promotion and sale, they used and maintained their facilities, serviced the territory, retained inventories and performed other functions with respect to the Association's product normally found in exclusive distributor contracts. In return, the Association promoted its products by extensive advertising and benefits to the Peckarsky salesmen. The record shows that there were incidents in which the Association policed the Peckarsky territory by having salesmen from other distributors selling its product removed from the Peckarsky area. In 1947, the Association authorized advertisements to be placed in a number of newspapers in Wisconsin cities describing the Peckarsky companies as its exclusive distributor of Aristocrat brandy. Upon that authorization the Peckarsky Companies placed such advertisements. In a letter written by Perelli-Minetti, in 1957, the Association recognized that the Peckarsky Companies were the exclusive distributors and that these arrangements would be enforced.

20 Wis.2d 110, 123, 121 N.W.2d 308, 315 (Wis.1963).

7

And although there was no written agreement in *California Wine Ass'n,* the Court later explained that exclusivity could arise (as in *Brauman*) even when there was a written contract that was silent on the issue:

> In the instant case, on the basis of the holding in *California Wine Asso.*, the letter agreement dated May 3, 1954, was a valid contract. Over the period of the relationship, Simon Bros. had an exclusive distributorship for Miller products and in return for that distributorship Simon Bros. in the May 3, 1954, agreement promised to expend its best efforts in distributing and selling Miller beer in its territory. Under *California Wine Asso.*, this promise to promote the sale of Miller's product is sufficient consideration for the exclusive distributorship.

*Simon Bros. Co., Inc. v. Miller Brewing Co.,* 83 Wis.2d 701, 708, 266 N.W.2d 369, 372-73 (Wis. 1978). In a state circuit court case, then-Reserve Judge Currie summarized matters as follows:

> Where there is no express contract with respect to exclusivity the common law may create by implied contract an exclusive dealership from the course of conduct of the parties. . . . However, such an implied contract of exclusive dealership will not be created where it is contrary to the intention of the grantor or seller party and such intention is made known to the dealer or purchaser party before any sale is made to the latter, or the surrounding circumstances are such as to negate any exclusive dealership.

*Ed Phillips & Sons Madison, Inc. v. Ed Phillips & Sons Co., Inc.* 1975 WL 15493, 11 (Wis. Ct. Cir. 1975).

What these cases demonstrate is that even though a distributorship agreement may be silent as to exclusivity, the arrangement may in fact become an exclusive one through the parties' course of conduct so long as the grantor's intention to avoid granting exclusivity was not manifest. This is reflected in some of the cases cited by Kaeser, in which the dealership agreement was expressly *non*-exclusive. *See, e.g., Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.,* 146 Wis.2d 568, 571, 431 N.W.2d 721 (Wis. Ct. App. 1988); *see also The Wisconsin Compressed Air Corp. v. Gardner Denver, Inc.,* 571 F. Supp. 2d 992, 998 (W.D. Wis. 2008) ("The distributorship agreement states

8

that defendant appoints plaintiff 'as a non-exclusive, authorized Distributor' and later states that the agreement is 'nonexclusive.'") But when the agreement is silent, as here, a dealer can avoid a motion to dismiss when he pleads circumstances that could give rise to exclusivity. As CPR has shown, even Kaeser seemed to believe the dealership was an exclusive one and the parties certainly acted as though that were the case. CPR could thus show at summary judgment or trial that it had an exclusive dealership agreement with Kaeser the competitive circumstances of which were changed when Kaeser began selling through other channels. Accordingly, the motion to dismiss the § 135.03 claim will be denied.

**III. Section 135.04**

CPR's § 135.04 counterclaim contests Kaeser's attempt to terminate or change the competitive circumstances of the dealership by providing written notice. Section 135.04 provides, in part, as follows:

> Except as provided in this section, a grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances. The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency. If the deficiency is rectified within 60 days the notice shall be void.

Wis. Stat. § 135.04.

This section interplays with § 135.03, which prohibits dealers from terminating a dealership without "good cause." Wis. Stat. § 135.03. Thus, the "deficiency" identified in a notice under § 135.04 must be a significant deficiency such that it would constitute "good cause" for the termination unless it is cured within the time specified. And "good cause" is not viewed solely from the perspective of the grantor, it is based on the conduct of the dealer and is akin to the "cause"

9

required to terminate a tenured employee. *Remus v. Amoco Oil Co.,* 794 F.2d 1238, 1240 (7th Cir. 1986). Section 135.02(4) defines "good cause" to mean either a "failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor . . . which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers," or "bad faith by the dealer in carrying out the terms of the dealership."

Kaeser argues that it is entitled to terminate CPR's dealership because it complied with the notice provisions set forth above. It sent CPR the letter on July 17, 2008 instructing CPR to provide a business plan, and on November 19 it sent another letter warning it of a possible termination. Kaeser posits that either of these were adequate notices. As to the July 17 letter, CPR *did* submit a business plan – it was just unsatisfactory in Kaeser's view. As noted above, however, the question is not how Kaeser subjectively viewed the business plan, the question is whether the allegedly poor quality of the plan constitutes "good cause" based on the reasonableness considerations set forth in § 135.02(4). That question is not presently before me, and in any event such a question is likely unresolvable in the context of a motion to dismiss. Thus, the argument that Kaeser's July notice complied with § 135.04 begs the question of whether there was "good cause" for the notice in the first place.

Nor does the November notice solve the problem. As set forth above, that notice was wholly conditional on CPR achieving additional sales: "If CPR fails to achieve satisfactory growth by not meeting the quarterly levels of the attached growth chart for two or more consecutive quarters, its refusal to agree to the contractual change Kaeser requested will, in the event a change becomes

10

necessary, put Kaeser in the position of having to terminate the CPR relationship on 90 days' notice." (Answ., Ex. L.) The letter thus merely warns CPR that *if* things did not improve, Kaeser *might* institute termination notice proceedings. It is, in effect, notice of a possible notice.

But, as suggested earlier, all this talk of notices begs the question about whether there was "good cause" in the first place. In other words, regardless of whether the notices Kaeser sent were technically adequate, there must be good cause before a dealership may be terminated or non-renewed. Taking CPR's allegations as true, the failure to submit a business plan was nothing more than a ruse to trigger Kaeser's ability to terminate the dealership – not for "cause" but because Kaeser wanted to begin competing with CPR through direct and internet sales. As such, there was no good cause for the proposed termination, and thus the notices do not suffice to allow Kaeser to terminate the dealership. Accordingly, to the extent there is a counterclaim based on § 135.04, the counterclaim will not be dismissed.[2]

**III. Good Faith and Fair Dealing**

Finally, Kaeser moves to dismiss CPR's claim alleging a violation of the duty of good faith and fair dealing for its actions. Although the common law imposes an implied duty of good faith upon contracting parties, it should go without saying that such a duty cannot be breached when a party engages in behavior specifically authorized by their contract. *The Wisconsin Compressed Air Corp.,* 571 F. Supp.2d at 998. Thus, because the distributor agreement here allows Kaeser to

---

[2]It is not at all clear that CPR has a "counterclaim" based on § 135.04. It is simply a response or defense to Kaeser's request for declaratory relief. As such, it is not clear that the motion to "dismiss" this claim is properly brought – it is more akin to a motion for judgment on the pleadings – but for the sake of completeness I have addressed both sides' arguments on the point.

11

terminate without notice, there arguably has been no violation of any implied duties.[3] But there is more to the allegations than that. CPR alleges that Kaeser has been working behind its back to undermine its business, and as noted above CPR may be able to show that it had an exclusive dealership with Kaeser. Given the behavior cited in the answer and counterclaim, I cannot say at this stage of the proceedings that Kaeser fulfilled its duties of good faith and fair dealing.

It is possible that the facts will support a different story, but for now the pleadings are all that matter, and they suggest a grantor who wanted to change its business model to incorporate internet and direct sales. An exclusive dealership would obviously pose a roadblock to that plan, and so the grantor contrived to trump up grounds for terminating that dealership (the "business plan") once it was clear that the dealer refused to agree to proposed non-exclusivity agreements that would pave the way for Kaeser to proceed. This behavior is not *malum in se*, of course, but Wisconsin's dealership law trumps what would otherwise be perfectly acceptable free market behavior. And for present purposes, the pleadings state claims for violations of that law as well as the duty of good faith and fair dealing.

The motion to dismiss is, therefore, **DENIED**.

**SO ORDERED** this ___18th___ day of September, 2009.

                                              s/ William C. Griesbach
                                              William C. Griesbach
                                              United States District Judge

---

[3] It is unclear what such a claim would add to an WFDL violation claim, as the WFDL provides far more protection under these circumstances than the common law.