UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KAESER COMPRESSORS, INC.,

        Plaintiff,

v.                                   Case No. 09-C-521

COMPRESSOR & PUMP REPAIR
SERVICES, INC.,

        Defendant.

## DECISION AND ORDER

Plaintiff Kaeser Compressors, Inc. brought this diversity action seeking a declaration that the refusal of Defendant Compressor & Pump Repair Services, Inc. ("CPR") to sign a new dealership agreement constitutes good cause for termination under the Wisconsin Fair Dealership Act ("WFDL"). CPR also brought a counterclaim alleging violations of the WFDL, and on September 18, 2009, I denied Kaeser's motion to dismiss that counterclaim. Following discovery, Kaeser has moved for summary judgment. For the reasons given below, Kaeser's motion will be granted in part and denied in part.

**I. Background**

Much of the background underlying this action was provided in this Court's decision denying Kaeser's motion to dismiss. In short, the dispute between the parties arose in 2008 when Kaeser, after twenty years of doing business with CPR, demanded that CPR submit a satisfactory

business plan or face the loss of its exclusive right to sell Kaeser compressors in the Wisconsin and Minnesota markets. Kaeser explains that it conducted a study of its distributors and concluded that CPR ranked fifteenth out of seventeen dealers who met certain sales minimums. In a nutshell, Kaeser believed that CPR was underperforming and failing to achieve the market penetration that other similarly situated dealers were obtaining. CPR ultimately submitted a business plan, but Kaeser found it unacceptable.

Kaeser soon asked CPR to sign a new dealership agreement that would allow Kaeser to appoint other dealers to CPR's territory or compete with CPR itself. CPR refused to sign. Kaeser developed the agreement as a uniform agreement that would govern its relationships with all of its thirty-five dealers throughout the country. The new agreement included provisions governing arbitration, participation in dealer training programs, and, as noted above, it contained provisions eliminating CPR's exclusive right to sell Kaeser products in its territory. The other thirty-four Kaeser dealers signed the agreement, although many of them "pushed back" and sought special accommodations. Kaeser states that it refused to vary the terms of the agreement for any of them, and that CPR is the only remaining holdout.

**II. Analysis**

**A. CPR's Refusal to Sign the Uniform Agreement**

The focus of Kaeser's summary judgment motion is CPR's refusal to sign the new proposed agreement. Under the WFDL, a grantor like Kaeser may terminate a dealership agreement only for good cause. Wis. Stat. § 135.03. As defined in the statute, good cause includes a dealer's failure to comply with "essential and reasonable requirements imposed upon him by the grantor," as long as the same requirements are imposed on "similarly situated dealers." Wis. Stat. § 135.02(4)(a).

As such, Kaeser argues that even if the WFDL applies,[1] it is entitled to terminate CPR's dealership because it was essential and reasonable to require CPR to sign the proposed uniform contract, which was also imposed upon similarly situated dealers throughout the country.

CPR argues that there is a genuine issue of material fact as to whether imposition of the new contract was an essential and reasonable requirement. In its view, the new contract was not "essential" because Kaeser operated profitably for decades without it, and it spent several years considering the terms it would adopt in the agreements. Since there was no urgency to the whole process, Kaeser cannot now claim the new terms are somehow "essential" to its way of doing business. In addition, Kaeser and CPR have continued to do business under the *status quo* (*i.e.,* without a new contract) for two years now, which suggests the new contract is not a key component of Kaeser's ability to conduct its business. Kaeser no doubt considers the new contract essential for its ability to increase its profits, but it is not "essential" to the company's business model or its relationship with dealers.

CPR also questions the reasonableness of the proposed terms. Although Kaeser has relied on the fact that all of its other dealers agreed to the terms, CPR protests that these dealers were "coerced" because Kaeser threatened to terminate their dealerships if they did not agree. Thus, the involuntary assent of other dealers cannot speak to the reasonableness of the terms. In addition, Kaeser refused to negotiate with CPR, despite CPR's willingness to agree to what in its view was a reasonable new contract.

CPR's argument is premised on the belief that there are two distinct "prongs" of the WFDL's good cause definition, both of which must be met before a dealer may terminate for good

---

[1] Kaeser disputes whether CPR actually had an exclusive dealership arrangement protected by the WFDL, but that issue is not presently before me.

cause. Although the statute requires new requirements imposed by a grantor to be both essential and reasonable, courts have noted that these terms "are closely related and were clearly intended to be read together." *Deutchland Enterprises, Ltd. v. Burger King Corp.,* 957 F.2d 449, 452 (7th Cir. 1992). In other words, a court need not determine whether each requirement imposed by a grantor is both "essential" and "reasonable;" it must instead analyze good cause as a whole. One reason for this *gestalt* approach, surely, is that very few proposed changes could be deemed "essential" to a grantor's business, that is, necessary to prevent imminent bankruptcy. For example, as CPR notes, the mere fact that the parties had been doing business in a certain way for years would undercut the idea that the new language is actually *essential* to Kaeser's business. The point of the statute, instead, is to allow grantors to make non-discriminatory changes in their dealership regime so long as those changes are reasonable and important to their overall business model. Accordingly, rather than determining whether the proposed new contract was actually "essential," I must determine whether it was a commercially reasonable requirement imposed by the grantor. As the Seventh Circuit has put it, "the grantor must therefore show three things in order to justify its proposed change: (1) an objectively ascertainable need for change, (2) a proportionate response to that need, and (3) a nondiscriminatory action.*"* *Morley-Murphy Co. v. Zenith Electronics Corp.,* 142 F.3d 373, 378 (7th Cir. 1998).

Kaeser cites a number of factors underscoring the commercial reasonableness of its proposed contract. First, it is essential to have uniform contracts so that it can streamline and standardize its relationships with dealers across the country. *Moodie v. School Book Fairs, Inc.,* 889 F.2d 739, 746 (7th Cir. 1989) ("[W]e believe failure to sign the agreement constituted a failure to comply substantially with reasonable requirements. A company is entitled to maintain uniform contract terms with its many dealers.") Kaeser is correct that cases like *Moodie* have recognized a

manufacturer's desire for uniformity as a legitimate business need. But here it is not the uniformity itself that is objectionable to CPR, but the substance of the new terms set forth in the proposed uniform agreements. A desire for uniformity is one factor that may be considered in judging the reasonableness of a manufacturer's demands, of course, but surely it is not the only factor. Otherwise a manufacturer could impose draconian (but uniform) new terms on its dealers (or effect a uniform "blanket termination") and simply cite a generic need for uniformity to justify the changes.

Kaeser has a better argument on the substance of the proposed changes. First, the fact that every other dealer has signed off on the new contract is highly suggestive that its terms are commercially reasonable. There is a free market for compressors (Kaeser is not the dominant manufacturer in that market), and if all of the other thirty-four dealers voluntarily agreed to the new terms and decided to continue selling Kaeser products, then that speaks volumes about the reasonableness of its proposal. CPR suggests that these dealers were "coerced" and that we should not place any weight on their decision to agree, but it has provided no evidence of anything other than market forces at work: all other dealers deciding whether to "take it or leave it" chose to take it. And Kaeser notes that it would not be rational for so many dealers to sign off on terms that are akin to a mutual suicide pact.

Second, Kaeser argues that non-exclusivity is a perfectly reasonable commercial practice. Of course the dealer would prefer to be exclusive so that it does not have to worry about competing with others in the sale of the manufacturer's product. Exclusivity can be a key component of a dealership relationship when the dealer invests significant assets in training, service, and the like, so that it need not worry that it will forfeit those sunk costs if a competitor (or the grantor itself) whittles away at its business. But here, there is no suggestion that Kaeser has another grantor in

mind to compete directly with CPR, and there is only a hint that Kaeser itself wants to compete with CPR in any serious fashion. Kaeser's direct competition thus far is limited to a relationship with Sears, which has not produced any sales in CPR's territory, as well as its own online sales through its website and eBay of less than $20,000. (Kaeser also recently made a direct equipment sale to a company in Mount Pleasant, Wisconsin.) Thus, Kaeser argues that it merely wants to allow itself certain flexibility in marketing its products without running afoul of an exclusivity arrangement with CPR. Because such an arrangement involves no real threat to CPR's business, a non-exclusive dealership arrangement under these circumstances is perfectly reasonable.

The thrust of Kaeser's argument is that CPR's objection to the new contract cannot be viewed in a vacuum. Instead, we must remember that the WFDL and its protections will still apply even after the new contract is signed. For example, if Kaeser exercised its new contractual power to open up its own dealership across the street from CPR, CPR would be able to invoke the WFDL's protections against constructive termination. *Remus v. Amoco Oil Co.,* 794 F.2d 1238, 1241 (7th Cir. 1986). Thus, the WFDL's protections will mute Kaeser's ability to compete directly against CPR, and in considering the reasonableness of the proposed contractual terms a court must consider not just the terms themselves but how those terms could be muted by the WFDL.

The parties cite a number of cases for competing principles. CPR relies heavily on *Kealey Pharmacy & Home Care Svcs., Inc. v. Walgreen Co.,* 761 F.2d 345 (7th Cir. 1985). There, Walgreens decided to terminate all of its agreements with some 1,400 dealers nationwide. Several owners of Wisconsin dealerships sued under the WFDL. Walgreens argued that the WFDL does not apply to "blanket terminations," but the Seventh Circuit agreed with Judge Crabb in concluding that even blanket terminations of dealerships are subject to the good cause requirement. "Walgreens simply cannot defend on an inadequate rate of return ground since the only permissible good cause

is defined in the statute as 'failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor' or '[b]ad faith by the dealer in carrying out the terms of the dealership.' Defendant has made no such showing . . ." *Id.* at 350.

Although *Walgreen* established that blanket terminations are subject to the WFDL's good cause requirement, that is not what is going on here. Kaeser protests that CPR is a valued dealership and that it repeatedly attempted to *avoid* terminating their relationship. In *Walgreen* there was no discussion of any new contractual terms proposed – it was simply a blanket termination. The Walgreen Company sent termination letters to its dealers as a *fait accompli*: there was no question that Walgreens wanted to shut them down and take over. Similarly, in *Morley-Murphy,* the Zenith Corporation proposed terminating the dealership itself – a very concrete and dramatic change. Here, by contrast, CPR has never even hinted that Kaeser is attempting to enact a blanket termination of its dealers or to put CPR out of business: instead, it offered all of its other dealers new dealership agreements rather than terminating them, and all of these other dealers signed. The grantor-dealership relationship remains Kaeser's business model.

Thus, Kaeser argues that this case is not like *Walgreen* but *Wisconsin Music Network, Inc. v. Muzak Ltd. Partnership,* 5 F.3d 218 (7th Cir. 1993). There, the Muzak company decided to enact a significant change to its dealership agreement by creating a "Multi-Territory Accounts" ("MTA") program: "Under the MTA program, national customers with more than fifty outlets located in at least four different Muzak affiliates' territories can negotiate a single contract with one representative of Muzak for uniform music service and standard rates for their outlets across the country." *Id.* at 220. Needless to say, this affected local affiliates because under the new program their customers (and sometimes their biggest customers) could now side-step dealers and deal directly with the Muzak corporation. A Wisconsin dealer balked at signing on to the new program

(despite the fact that all other dealers but one signed), and sought a preliminary injunction seeking to enjoin Muzak from terminating its dealership for failure to agree to the new terms. The Seventh Circuit affirmed the district court's denial of preliminary relief. It noted that the dealer had "offered no evidence of customers or profits it will lose as a result of the MTA program" and the grantor had explained why the new terms were commercially reasonable. *Id.* at 224.

This is a close case, and in truth none of the cases relied upon by the parties reveals a clear answer. Kaeser is correct that the WFDL's protections must be considered when assessing the reasonableness of a proposed change. In other words, because the WFDL's protections would still apply to the parties' relationship, the proposed new terms are not as draconian as CPR suggests. Even so, the WFDL really only protects CPR from a termination. To say that CPR will be protected from utter ruin is much different than saying it will be protected from serious competition. That is, although the WFDL would prevent Kaeser from running CPR out of business, *Remus*, 794 F.2d at 1241, it will not prevent it from significant direct competition or from newly-named competing dealers. This is because once CPR agrees to a non-exclusive dealership arrangement, it will no longer be able to protest if Kaeser appoints another dealer or competes directly, even if that competition significantly (but not fatally) impacts its business.[2] *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.,* 146 Wis.2d 568, 576, 431 N.W.2d 721, 725 (Wis. Ct. App. 1988) ("because Super Valu's dealership agreement with Cahak specifically authorizes Super Valu to franchise other stores whenever and wherever it wishes, we do not see how the issuance of another franchise would

---

[2]Among the many uncertainties surrounding the WFDL is whether *any* action (short of *de facto* termination) contemplated by the new agreement would be allowed by the WFDL merely because the action is allowed under the agreement. It is conceivable that Kaeser could violate the WFDL by competing with CPR even if it did not violate the new agreement or cause a *de facto* termination. *Girl Scouts,* 549 F.3d at 1097.

8

change 'the competitive circumstances of [the] dealership agreement' in violation of the law.") In sum, the mere fact that the WFDL might prevent Kaeser from driving CPR out of business is of small comfort to CPR, because it would not protect CPR from significant or even substantial competition. Seen in this light, CPR's refusal to sign is far more reasonable.

More importantly, even if we accept Kaeser's argument that the implications of the new contract would be tempered by the WFDL, it does not necessarily follow that the new terms are essential and reasonable. CPR persuasively notes that the burden is on Kaeser – not CPR – to explain why the new contract is reasonable, and at best Kaeser has created a genuine dispute on that fact. The proposed new contract would allow Kaeser to compete significantly with CPR and to appoint other dealers in CPR's territory (even with the WFDL's protections). Even though other dealers agreed to the new terms, the new contract effects a very substantial change in the dealership arrangement (as set forth above). It is Kaeser's burden to explain not just why and how the marked changes it proposed solve important economic problems it has, but how the new contract is tailored to achieve those ends. *Morley-Murphy Co.,* 142 F.3d at 378 ("the grantor must therefore show three things in order to justify its proposed change: (1) an objectively ascertainable need for change, (2) a proportionate response to that need, and (3) a nondiscriminatory action.")

Supporting my conclusion that Kaeser has not met its burden (at least at this stage) are the Wisconsin Supreme Court's decision in *Ziegler Co. v. Rexnord, Inc. (Ziegler II),* 147 Wis. 2d 308, 433 N.W.2d 8 (1988), and the Seventh Circuit's application of that decision in *Morley-Murphy, supra,* and *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.,* 549 F.3d 1079, 1099 (7th Cir. 2008). In *Ziegler II,* the grantor, Rexnord, argued that its substantial economic

9

losses justified its decision to non-renew its dealership agreement with Ziegler. (Instead, it offered a less lucrative agency relationship.) The Supreme Court allowed that a grantor's own economic problems could justify a change in the dealership relationship, but it recognized that "[t]he need for change sought by a grantor must be objectively ascertainable. The means used by a grantor may not be disproportionate to its economic problem." 147 Wis. 2d at 320, 433 N.W.2d at 13.

The Seventh Circuit addressed *Ziegler II* at length in *Girl Scouts*. In *Girl Scouts,* the national Girl Scouts organization announced a plan "to reduce, by the end of 2009, the number of local councils from approximately 315 to 109, merging the local organizations to form larger, 'high capacity' councils." 549 F.3d at 1084. This action would have dramatically changed the local Manitou Council's territory, and the Manitou Council sued for a preliminary injunction to prevent the change. The Seventh Circuit sided with the local council, largely because the national Girl Scouts failed to articulate a salient business need for the proposed changes.

> In this case, unlike in *Ziegler II* and *Morley-Murphy*, we question both the objective need and the proportionate response of GSUSA's [the grantor] attempt to unilaterally reduce Manitou's jurisdiction. This is because the circumstances confronting GSUSA differ markedly from those facing Rexnord and Zenith, both of which were reacting to extended periods of substantial economic losses. GSUSA arguably presents no objective economic need for its proposed action; at the very least, its financial circumstances are a far cry from the dire economic straits confronted by Rexnord. GSUSA's financial statements indicate that GSUSA's operating revenues exceeded its operating expenses in Fiscal Years 2005 and 2006, earning operating profits of $886,000 and $2.5 million, respectively. Further, we find little support for GSUSA's argument that intangible concerns such as "fading brand image" and "waning program effectiveness," without a tangible effect on the bottom line, present the types of concerns Wisconsin courts have contemplated by the "good cause" provision of the WFDL.

*Id.* at 1099 (citations omitted).

Here, as in *Girl Scouts,* the grantor has difficulty articulating both an objective need for the proposed change as well as an explanation for how the change represents a proportional response to its economic concerns. As noted above, Kaeser cites a need for uniformity in its contracts, but an abstract desire for uniformity is (without more) an "intangible concern" about housekeeping rather than a salient economic need. *Id.* Moreover, Kaeser has not explained how its desire for uniformity (reasonable though it may be) would require the specific manifestation of uniformity proposed here, namely, a contract whose terms would uproot a longstanding dealer's exclusivity. *Ziegler II,* 147 Wis.2d at 320, 433 N.W.2d at 13. ("The means used by a grantor may not be disproportionate to its economic problem.") That is, if simple uniformity were the goal, it could have been achieved here with a more modest proposal that CPR would have agreed to (and if it did not agree, Kaeser would have had good cause to terminate the dealership). *Ziegler II,* 147 Wis. 2d at 319, 433 N.W.2d at 13 (describing facts of *Remus* as "grantor's unilateral and system-wide change of *minor* terms of the franchise agreement.") CPR would argue, and a factfinder could agree, that taking the major step of eliminating a dealer's longstanding exclusivity simply to achieve the abstract goal of contract uniformity is like prescribing dangerous narcotics to cure a simple headache: it might achieve its purpose, but the patient could experience serious side-effects. Kaeser's other justifications for the proposed changes similarly do not cite either a pressing economic problem Kaeser is facing or explain how the changes will allow it to "grow the pie" significantly by seizing economic opportunities that only this particular proposed contract would allow. The *Girl Scouts* court contrasted the national Girl Scouts organization, which was economically successful, with the more dire economic position of Zenith and Rexnord, both of whom were able to articulate pressing business reasons for their proposals. Here, Kaeser more

11

resembles the Girl Scouts than either of those two companies. 549 F.3d at 1099. In sum, the cases cited above require the grantor to cite, in concrete terms, an economic problem it is facing[3] and then explain how the changes it is proposing are a proportional response to that problem. Although a factfinder could conceivably agree with Kaeser, I am not satisfied that the reasons it has cited articulate an objective need for change, and neither am I convinced that the specific changes proposed here are a proportional response to that need. At most, they have created an issue of factual dispute that I cannot resolve in Kaeser's favor based on the record before me.

This is not to say that the above exercise is a comfortable one. The Fair Dealership law was designed to give a particular class of citizens – dealers – a leg-up in their relationships with mostly out-of-state manufacturers, who were viewed to have outsized bargaining power and an ability to exploit local distributors. But though the law may have been well-intentioned, it has sometimes required judges and juries to sit as economic commissars intermediating disputes between business entities or opining on the wisdom of various corporate structures (or even Girl Scout councils). Judges and juries, of course, have little training in assessing whether business activities are "reasonable" or "essential," and the costs and time involved in reaching a final decision are a product of the law's inherent uncertainties, many of which are on display in this case. Despite these concerns, I conclude that a trial will be required to determine the questions posed here.

**B. CPR's Counterclaims**

CPR has brought counterclaims alleging violations of the WFDL and a breach of the duty of good faith and fair dealing. Specifically, CPR alleged that Kaeser's actions (those detailed above

---

[3] Presumably a grantor could also cite a pressing economic *opportunity* it wants to seize.

as well as in this Court's decision and order denying the motion to dismiss) constituted a constructive termination of the dealership without proper notice. But even if Kaeser fails to prove that its proposed new terms were reasonable and essential, that is a far cry from constructive termination. Kaeser is correct that merely *agreeing* to new terms does not preclude CPR from engaging in its business. If Kaeser decided to set up shop across the street from CPR, things would be different. But for now we are merely talking about abstract contractual terms that have not been implemented or exercised yet, and there is no hint at present that Kaeser will be driving CPR out of business. As such, under these circumstances the proposed changes cannot be considered a constructive termination.

CPR has also argued that Kaeser explicitly terminated the dealership in April 2009 when it presented the new uniform agreement to CPR. This proposition is inconsistent with CPR's position in this case, including its answer, where it "admits that the agreement attached to the Complaint as Exhibit A is still in force between the parties." (Answ., ¶ 6.) Nevertheless, it now asserts, based on the depositions of one present and one former Kaeser employee, that the agreement was somehow terminated in April 2009, even though no one appeared to recognize that fact at the time or at any time since. Yet the depositions CPR relies on do not even remotely support this novel argument. Both witnesses testified (in passing) that they believed the existing agreement "would" or "will" be cancelled after the give-and-take between Kaeser and CPR in 2008. (Dkt. # 62, Ex. G. at 155; Ex. O at 126.) That is not surprising, since it would be an obvious consequence of CPR's signing a new, different contract. The witnesses did not testify that Kaeser had unilaterally terminated the agreement, and neither are there any CPR witnesses who support such a claim. In

13

short, nothing in the record even arguably supports the notion that Kaeser terminated the parties' agreement in April 2009. Accordingly, the counterclaims will be dismissed.[4]

**C. Minnesota Territory**

Kaeser's dealership relationship with CPR extends beyond Wisconsin's borders into Minnesota, and Kaeser also seeks a declaration that it may terminate CPR's dealership rights in Minnesota even if a genuine issue of fact exists as to "good cause" under the WFDL. Kaeser first notes that the Minnesota territory was given to CPR in an addendum signed three years after the original dealership agreement. As such, it is a separate agreement between Kaeser and CPR relating to the Minnesota territory. In other words, it is not governed by the WFDL. Second, Kaeser argues that the WFDL does not apply to business relationships taking place outside of Wisconsin. Thus, even if the Minnesota territory were part of the same dealership agreement, the WFDL would not govern that aspect of the parties' relationship.

Kaeser's statutory argument is dispositive. In *Morley-Murphy*, the jury awarded lost profits to the dealer based on its lost business in Minnesota and Iowa. 142 F.3d at 379. On appeal, the Seventh Circuit concluded that the Wisconsin Supreme Court would construe the WFDL as applying only to a dealer's Wisconsin-based territory: "We think, in light of both the presumption against extraterritoriality and the troublesome nature of the constitutional questions that would be raised if the WFDL reached beyond Wisconsin's borders, that the Wisconsin Supreme Court would construe the WFDL as not applying to Morley-Murphy's sales of Zenith products in Minnesota and Iowa." *Id.* at 380.

---

[4]CPR has not addressed the good faith and fair dealing claim, and I thus find it waived. For the reasons stated herein, however, it should go without saying that Kaeser's actions did not violate any such duties.

CPR suggests that the Wisconsin Supreme Court has not followed the prediction of the Seventh Circuit. In *Baldewein Co. v. Tri-Clover, Inc.,* that court addressed the question of "when is a dealership 'situated in this state' under Wis. Stat. § 135.02(2), thereby entitling the dealer to protection under the Wisconsin Fair Dealership Law (WFDL)?" 2000 WI 20, 233 Wis.2d 57, 606 N.W.2d 145 (Wis. 2000). The *Baldewein* court concluded that before a dealer could avail itself of the protections of Wisconsin's Fair Dealership Law, it must establish that it has significant connections and investments in the Wisconsin market. That is because application of the WFDL must reflect "the legislative intent to protect investments in dealership relationships when the dealer makes a substantial investment in the *Wisconsin* market." 233 Wis.2d at 74, 606 N.W.2d at 152 (italics added). The supreme court did not hint that the WFDL would apply to business relationships outside of Wisconsin; it was merely addressing the question of when a dealer was "situated" in Wisconsin. The *Baldewein* court even recognized the issues raised by the Seventh Circuit in *Morley-Murphy* but acknowledged that those issues were not before it. 233 Wis. 2d at 71, 606 N.W.2d at 151 n.6. Accordingly, I cannot find anything in *Baldewein* that suggests the WFDL could govern a dealership relationship in another state merely because the dealer happens also to have a dealership governed by Wisconsin law. Kaeser is therefore entitled to a declaratory judgment that it may terminate CPR's Minnesota territory without running afoul of the WFDL.

## III. Conclusion

For the reasons given above, Kaeser's motion for summary judgment is **GRANTED** in part: CPR's counterclaims are **DISMISSED**, and it is entitled to a declaratory judgment indicating that it may terminate CPR's Minnesota territory. The motion is **DENIED** in all other respects. The

clerk will place the matter on for a telephonic scheduling conference, at which the Court will set a trial date and any further deadlines that may be required.

**SO ORDERED** this   14th   day of February, 2011.

                                                              s/ William C. Griesbach
                                                              William C. Griesbach
                                                              United States District Judge