# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KAESER COMPRESSORS, INC.,

       Plaintiff,

    v.                                  Case No. 09-C-521

COMPRESSOR & PUMP REPAIR
SERVICES, INC.,

       Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## AND ORDER FOR JUDGMENT

Plaintiff Kaeser Compressors, Inc. ("Kaeser"), sells industrial compressors, blowers, and related products manufactured by its German affiliate Kaeser Compressoren GmbH. Defendant Compressor & Pump Repair Services, Inc. ("CPR"), is a Kaeser distributor for the States of Wisconsin and Minnesota, and a portion of the Upper Peninsula of Michigan. Kaeser brought this diversity action seeking a declaration that its relationship with Defendant CPR was not a dealership within the meaning of the Wisconsin Fair Dealership Act ("WFDL"). Wis. Stat. § 135.01, et seq. Kaeser also sought a determination that in the event the relationship was found to constitute a dealership, Kaeser had good cause to terminate the arrangement based upon CPR's refusal to sign a new agreement.

The Court partially granted Kaeser's motion for summary judgment with respect to its Minnesota territory on the ground that the WFDL did not apply to business relationships outside of Wisconsin. (Docket 88, p 14-15). Kaeser's motion was denied as to the remaining territory,

however, and the matter was set for trial. CPR had demanded a jury, and the question then arose as to whether it was entitled to a jury determination of the issues remaining in the suit. Kaeser took the position that the relief sought was equitable in nature and thus CPR was not entitled to a jury.

On March 18, 2011, the Court concluded that CPR was entitled to a jury trial and denied Kaeser's motion to strike its demand. Given the uncertainty of the law, however, the Court also indicated that it would makes its own findings of fact and conclusions of law based on the evidence presented at trial so that in the event it was later determined that CPR was not entitled to a jury trial, the parties would not be forced to try the case a second time.

The four day trial commenced on May 9, 2011. The jury returned a verdict in which it found that the relationship between the parties was a dealership within the meaning of the WFDL and, further, that CPR's refusal to sign the proposed new agreement did not constitute good cause for termination. What follows is the Court's findings of fact and conclusions of law based upon the same evidence.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I. Jurisdiction**

Federal jurisdiction over the dispute between the parties exists under 28 U.S.C. § 1332. Kaeser is a business corporation incorporated under the laws of the Commonwealth of Virginia with its principal place of business located in Fredericksburg, Virginia. CPR is a business corporation incorporated under the laws of State of Wisconsin, with its principal place of business located in DePere, Wisconsin. The parties are therefore citizens of different states.

The amount in controversy is in excess of the jurisdictional amount of $75,000. CPR purchases millions of dollars worth of Kaeser products every year. CPR's annual sales of Kaeser's Sigma line of compressors in Wisconsin for the past three years ranges from $3.8 million to almost $5 million. Additional revenue for service related to Kaeser products over the same period exceeds a million dollars per year. CPR contends that if Kaeser prevails in the action and terminates its right to distribute Kaeser products, its entire business would be destroyed.

## II. Relationship between Kaeser and CPR

Kaeser is a supplier to the U.S. market of compressors (the Sigma line), parts, and related industrial products manufactured primarily by an affiliated company in Germany. Currently, Kaeser sells these products through a network of distributors and Kaeser branch locations in the United States as well as by direct sales. The percentage of Kaeser products distributed in the United States either directly by Kaeser or through its branch locations, as compared to its independent distributers, has increased since 2001.

CPR, which was started by Jim Kinate and his wife Kathy, became a distributor for Kaeser's Sigma line of compressors in 1988, when the parties entered into a written agreement that has since been amended three times. (Exh. 1). Since it first became a Kaeser distributor in 1988, CPR has operated as an exclusive distributor for Kaeser products within its territory. Under the written agreement the parties signed on October 24, 1988, CPR agreed that it would "represent Kaeser exclusively, and at no time while this agreement is in effect will [CPR] sell other equipment in direct competition with the Kaeser line of products." (Exh. 1 ¶ 1). The agreement also provided that CPR would initially stock a minimum inventory of $25,000 representing a cross-section of

Kaeser product line and maintain a sufficient spare parts inventory to service Kaeser compressors and accessories in the field. CPR also agreed to open a sales and service branch in the Milwaukee area by January 1, 1991. If it failed to do so, CPR agreed that a number of counties would be reassigned to a distributor in the Milwaukee area. (*Id.*).

The agreement also provided that CPR would annually provide Kaeser with the company's financial statement upon completion of the fiscal year, strive to meet mutually agreed upon sales goals, and maintain service and maintenance personnel who are properly trained to perform service and repair work based on Kaeser's standards. The agreement noted that Kaeser provides periodic service schools for that purpose and expected CPR personnel to attend at least one of the schools.

In return, Kaeser agreed that it would assist CPR in selling its products by making available literature covering their entire line of products and assist CPR with training and sales of equipment, servicing and aftermarket sales. Kaeser specifically agreed that all sales leads in CPR's territory received by Kaeser as a result of their advertising efforts would be forwarded to CPR. In addition, Kaeser promised that its district sales manager would be available to assist in marketing efforts and that CPR could contact its engineering department for any technical questions or problems. (Ex. 1.)

On September 23, 1991, Kaeser signed an addendum to the agreement with CPR whereby Kaeser expanded CPR's territory to include the entire state of Wisconsin, as well as the state of Minnesota. Under the terms of the addendum, CPR agreed that by January 1, 1992, it would have a full-time experienced compressor sales person working in the western half of Wisconsin and the entire state of Minnesota. On July 1, 1992, CPR was to have a sales office established in Minneapolis/St. Paul area to serve the newly assigned territory. By January 1, 1993, CPR was to

have a service department added to the sales office with Kaeser-trained mechanics. In the event CPR did not meet these conditions, Kaeser reserved the right to reassign the territory. (Exh. 3.). Finally, on December 4, 1995, Kaeser entered into a separate agreement with CPR concerning its Omega blower line of products. Under this agreement, CPR agreed it would represent Kaeser exclusively and at no time while the agreement was in effect enter in to any similar agreement with a competitive blower manufacturer. Kaeser, however, reserved the right to handle original equipment manufacturers ("OEM's") and direct accounts in order to maintain the blower business from those accounts. Kaeser's territory for the Omega blower was the entire state of Wisconsin and, again, it agreed to keep on set levels of inventory and spare parts. (Exh. 5).

At the time CPR became a Kaeser distributor, the Kaeser product was almost unknown in Wisconsin and Minnesota. Largely through CPR's efforts, sales of Kaeser compressors within CPR's territory significantly grew over the last twenty years to the point where Kaeser now enjoys a market share of between 13% and 14%. CPR's success did not come without significant effort. The market for compressors was considered by all parties a mature market in the industrialized Midwest with Ingersol Rand occupying the dominant position and various other manufacturers also having a strong presence. Moreover, though the quality of Kaeser's compressors was high, the product was more expensive than those with which it competed. Jim Kinate was initially able to use contacts he had developed through his work with municipal waste water treatment systems to successfully introduce the Kaeser brand. Over the years, CPR has also put on seminars featuring Kaeser products in various locations within its territory, display Kaeser products at various tradeshows, and promoted Kaeser products in its advertising.

Since it became a Kaeser distributor, CPR's sales and service staff grew to twenty employees in its three separate locations in De Pere, New Berlin and Minnesota where it maintains offices, storage facilities, equipment and inventory. (Ex. 1079, 1080.) CPR's investment in its facilities and, particularly, its employees is substantial. Its current inventory is valued at more than $725,000, approximately 70% of which represents Kaeser products. (Ex. 1068.) Employees are provided company cars, laptops, cell phones and other equipment needed to perform their jobs. Training and experience are essential to successfully sell, maintain, and repair industrial compressors and other equipment. CPR's employees have received education and training that is specific to the Kaeser line of products. CPR provides its own training and regularly sends its employees for training sponsored by Kaeser at its Fredricksburg offices and in other locations. CPR employees also receive training and education about Kaeser products through Kaeser literature and online "webenars." CPR personnel have also won numerous awards for selling and servicing Kaeser products. "With at least 2,350 Sigma units sold as of 2009, CPR ranks at or near the top of Kaeser distributors in terms of rotary screw compressors in the field." Stipulation of Facts, ¶ 14.

More than 90% of CPR's sales revenue is for Kaeser products. Although CPR notes on its website that it services and repairs other products in addition to Kaeser's, between 73% and 80% of its revenue from repairs and service is related to Kaeser products. In fact, CPR does not have access to the more specialized parts of other major brands of compressors, just as the distributors for other brands do not have access to the more specialized parts of Kaeser's compressors. Kaeser restricts access to the internal controls of its compressors to prevent outside service technicians from making improper and possibly dangerous adjustments. As an authorized Kaeser distributor, CPR is furnished with a unique key every year that allows them access to the internal controls of Kaeser's

compressors. Without such access, CPR would be limited to routine maintenance and replacement of generic parts and filters on Kaeser compressors as it is on other major brands.

## III. Dealership Under the WFDL

The WFDL, as applicable here, defines a dealership as follows:

A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a). As in most WFDL cases, there is no dispute between the parties here that an agreement existed between CPR and Kaeser under which CPR was granted the right to sell Kaeser's products. The dispute centers on whether there is a "community of interest" between the parties in the business of distributing those products.

The seminal case addressing the meaning of the phrase "community of interest" is *Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis.2d 593, 407 N.W.2d 873 (1987). There, the Wisconsin Supreme Court rejected a bright-line percentage-of-revenue test for determining whether a community of interest exists between a distributor and supplier, and instead fashioned a multifaceted analysis centered on two "guideposts" that were to be used to determine the WFDL's applicability. The two guideposts identified by the Court are a continuing financial interest and interdependence between the parties. 139 Wis. 2d 603-04. The requirement that there be a continuing financial interest "contemplates a shared financial interest in the operation of the dealership or the marketing of a good or service." *Id.* at 604. The interdependence guidepost focuses on "the degree to which the

7

dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.* The Court cautioned that "[a]lthough every contract involves some shared goals and coordinated efforts, more than a modicum of shared goals and cooperation is required to establish a community of interest." Given the purpose underlying the WFDL, the Court concluded that "the continuing financial interest" and "interdependence" required must be sufficient to "demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the person (thus giving the grantor inherently superior bargaining power)." *Id.*

The *Ziegler* Court then listed a non-inclusive set of "facets" that were to be considered in deciding whether such a relationship existed:

> how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

Id. at 606.

In the many cases it has decided under the WFDL, the Seventh Circuit has distilled this analysis down to two circumstances under which a community of interest will be found to exist: "first, when a large proportion of an alleged dealer's revenues are derived from the dealership, and,

second, when the alleged dealer has made sizable investments (in, for example, fixed assets, inventory, advertising, training) specialized in some way to the grantor's goods or services, and hence not fully recoverable upon termination." *Frieburg Farm Equipment, Inc. v. Van Dale, Inc.*, 978 F.2d 395, 399 (7th Cir. 1992). Of these two circumstances, it is clearly the second, the distributor's investment in what the Seventh Circuit has called "sunk costs," that is primary: "a retailer is a dealer only if it has made the kind of investments that would tempt an unscrupulous grantor to engage in opportunistic behavior-in other words, to exploit the fear of termination that naturally attends a dealer's investment in grantor-specific assets." *Id.*

## IV. CPR's Distributorship Is A Dealership

The evidence presented at trial establishes beyond a preponderance of the evidence that CPR's right to sell Kaeser products is a dealership within the meaning of the WFDL. Indeed, the Court finds the evidence of a dealership overwhelming. The parties had a continuing and shared financial interest in selling Kaeser products and were interdependent in the sense that they cooperated, coordinated their activities and shared common goals in their business relationship. Consideration of the ten facets identified in *Ziegler* and the Seventh Circuit's distillation of them confirms this conclusion.

The parties have dealt with each other for more than twenty-two years. CPR assumed substantial obligations pursuant to its contract with Kaeser at the inception of the relationship, and those obligation of increased over time. Kaeser was contractually obligated to maintain an inventory of Kaeser products valued at a minimum of $25,000, along with a sufficient spare parts to service Kaeser compressors. CPR established offices and warehouses in three different locations

throughout its territory, bought service vehicles and equipment and hired and trained personnel to sell and service Kaeser compressors. CPR expended substantial time and money advertising and promoting Kaeser's compressors to the exclusion of all other compressors to the point where Kaeser's market share in CPR's territory has grown from almost nothing to close to 14%. CPR is identified within the industrial compressor market with the Kaeser brand. Most of its revenue from supplementary services such as maintenance and repair of compressors is derived directly from its sales and installation of Kaeser compressors. Finally, the vast amount of CPR's revenue is derived from sale and service of Kaeser products. Considering both the amount of its revenue attributable to Kaeser products and its sunk costs in promoting, selling and servicing Kaeser compressors, the conclusion that a dealership exists between CPR and Kaeser is inescapable.

Kaeser's argument to the contrary is based on a conflict that has arisen between the parties in recent years over the need for additional salespersons and alternative ways to market and sell Kaeser products. The conflict between the parties appears to have come to the surface in April 2008 when Kaeser, after twenty years of doing business with CPR, demanded that CPR submit a satisfactory business plan. Kaeser had conducted a study and concluded that CPR ranked fifteenth out of seventeen distributors who met certain sales minimums. When CPR balked at the idea of submitting a business plan, Kaeser threatened CPR with the loss of its exclusive right to sell Kaeser compressors in its territory. CPR ultimately submitted a business plan in September 2008 that Kaeser found unacceptable. (Ex. 48, 52.) CPR then provided an addendum to the plan the following month. (Ex. 49.) Still not satisfied, Kaeser asked for a meeting in Fredricksburg.

At the meeting, Kaeser's President, Frank Mueller, emphasized that Kaeser was serious about seeing CPR adopt specific measures that would increase its sales over the next several years.

10

Jim Kinate, on the other hand, noted the economic downturn in the nation and indicated he was unwilling to make significant new investments at this time. In a follow-up letter, Kaeser expressed disappointment in CPR's failure to take steps to implement growth strategies and identify potential customers. In light of CPR's unwillingness to commit to additional growth in its territory, Kaeser indicated it needed to "provide for the possibility of arranging for additional distribution in the territory at some point in the future." (Ex. 57.) It therefore enclosed with its letter an addendum to CPR's 1988 agreement which was intended to confirm that CPR's right to distribute Kaeser compressors in its territory was not exclusive. Kaeser was asked to execute the addendum and return it to Kaeser. (*Id.*)

CPR declined Kaeser's request that it sign the addendum, and Kaeser followed with a letter again expressing its disappointment with CPR's response. Kaiser characterized CPR's plan as a "no-growth/slow-growth plan" and indicated that CPR could not reasonably expect to retain exclusive rights to an important territory if it cannot achieve reasonable sales growth. (Ex. 59.) In the face of CPR's refusal to sign the addendum, Kaeser decided to defer "the decision about additional sales effort in [CPR's ] territory" until it saw how it actually performed. (*Id.*) Kaeser then provided CPR with a Growth Chart showing quarterly sales goals for the following three years, and advised CPR that if it failed to meet quarterly levels for two or more consecutive quarters, its refusal to agree to the contractual change could lead to termination of its distributorship. (*Id.*) CPR responded with a letter in which it insisted its business plan "project[ed] reasonable and realistic growth given the maturity of the market, current and anticipated economic conditions in the United States and the competitiveness of Kaeser's products." (Ex. 60.) CPR assured Kaeser that it would continue to use its best efforts to sell Kaeser's products, but rejected Kaeser's attempt to impose

unreasonable and nonessential sales goals. Finally, CPR warned that any attempt to terminate CPR's dealership without good cause would result in legal action under the WFDL. (*Id.*) Kaeser acknowledged the parties' disagreement over the matter and took no further action at that time.

Kaeser argues that it is clear from this evidence that, whatever their previous relationship, Kaeser and CPR no longer shared a community of interest by 2008 or 2009. The evidence demonstrates, Kaeser contends, that by that time the parties did not share a strategic vision and were not cooperating in the pursuit of that vision. CPR came to believe sometime in the mid-2000s that Kaeser was "out to get them." Thereafter, Kaeser argues, CPR stopped working for the strategic vision that Kaeser held and began working for itself alone to protect its own monopoly position. Given the obvious conflict that had developed between them, Kaeser contends that the key elements of a community of interest were no longer present.

Kaeser recognized that independent distributors, such as CPR, did not want to risk investment in hiring and training more sales personnel in the hope that they would be able to generate enough additional sales and service income to provide a return. Hiring a new employee is always risky. It takes time to train a new sales person, and the costs of providing training, a car and equipment are high. If the economy has a downturn, or the new person doesn't work out or leaves too early, the distributor loses money. Many distributors, in Kaeser's view, became content with the level of sales they have already achieved and the additional revenue they were able to generate from servicing and maintaining their existing customers. Thus, they have little incentive to risk the investment required in order to expand their sales force. Kaeser, on the other hand, only made money through sales of product, not servicing and maintaining compressors its distributors

12

had sold. As this conflict of interest came to a head in 2008-09, Kaeser contends whatever community of interest that may have previously existed between the parties was extinguished.

But a dealership does not cease to exist simply because a conflict of interest arises between the parties. Conflicts between grantors and dealers, or suppliers and distributors, are inherent in the nature of the relationship. Indeed, the parties stipulated to the following facts:

> 19. One of the advantages to Kaeser of using independent distributors is that Kaeser can establish a presence in a marketplace with little financial risk.
>
> 20. One of the disadvantages to Kaeser's use of independent distributors is that Kaeser gives up some measure of control over the business operations of the distributors.
>
> 21. Kaeser does not have an interest in the independent distributor's profit margin so much as it is interested in having the independent distributor sell as much Kaeser product as possible.

(Dkt. 100, Stip. of Facts, ¶¶ 19-21.)

When a product is first being introduced into a new territory, the risk lies primarily with the distributor, and the supplier is largely dependent on the distributor for success. It is also at that point that the interests of both parties are most closely aligned. The income of both parties depends almost entirely on new sales of the product. Once the product is established and enjoys a solid customer base, however, the distributor's risk and incentive to invest more in sales personnel, assuming he retains the right to distribute the supplier's product, can lessen. As Jim Kinate explained, the distributorship becomes like an annuity to the extent that existing customers generate repeat business and service calls. This is not to say that the distributor does not still wish to increase sales. But he may not be as dependent on sales as he was at the inception of the dealership.

At the same time, the supplier's dependence on the distributor is reduced once the product is established since there now exists a solid foundation from which to grow sales even more. And since the supplier's income is derived almost exclusively from sales, the supplier retains a strong incentive to generate continued sales growth, especially since the cost of hiring and training additional sales personnel falls exclusively, if not primarily, on the distributer. Add to this the fact that the distributor and supplier may have substantially different views of the potential for sales growth in the distributor's territory, the need for additional sales personnel, and the condition of the national economy, and it is not surprising that serious conflicts arise.

It was precisely because of such conflicts that the WFDL was enacted. Recognizing the inherently superior power of grantors or suppliers, the Wisconsin legislature sought "to provide dealers with rights and remedies in addition to those existing by contract or common law" and "to promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis." Wis. Stat. § 135.025(2). If there were no conflicts between suppliers and distributors, there would be no need for a specialized law to address them. In light of this purpose, Kaeser's contention that the conflict of interest that arose between the parties extinguished the dealership makes no sense. If that were the law, then the mere fact of invoking the WFDL would destroy a dealer's right to its protection. For it is only when serious conflicts between the parties arise that a dealer would see a need to invoke the WFDL.

Whatever the phrase "community of interest" may mean, it does not mean the absence of serious conflict between the parties or a complete agreement on a strategic vision and perfect alignment of interests and goals. Even within the same organization it is difficult to find such agreement and cooperation. The Wisconsin legislature could have had no such illusions about the

14

relationship between the parties to a dealership. Here, for the reasons set forth above, the Court finds that the relationship between Kaeser and CPR was a dealership as that term is defined in the WFDL.

## V. The New Contract

In 2008, Kaeser introduced a new uniform distributorship contract to its 37 independent distributors across the country. In Kaeser's view, significant changes had occurred in the world since its original contract with CPR and its other distributors in the United States. The Internet was in its infancy at the time of CPR's initial agreement in 1988, for example, and was not a channel for distribution of industrial goods in the United States. Since that time, Kaeser believed that the growth of the Internet as a sales and marketing tool and the globalization of the economy called for new ways of reaching potential customers. Kaeser had opened branch offices or factory shops in various states and saw them as a way of gaining deeper penetration of the market. Based on its experience in areas where it maintained branch stores and its own assessment of the market, Kaeser believed that it could obtain a greater share of the market for its compressors.

In an effort to resolve the conflict between independent distributers like CPR who were reluctant to invest in new sales personnel and strategies, and its own desire to achieve a deeper market penetration for its products, Kaeser wanted the right to open branch offices in territories previously served exclusively by one independent distributor. Distributors satisfied with the level of sales and income they were able to generate without hiring additional sales personnel would be able to continue as they had. At the same time, through its company stores, Kaeser would be able to more aggressively pursue sales within the territory in an attempt to gain a deeper penetration.

Through this system of "dual distribution," Kaeser would be able to pursue what it viewed as potential sales revenue that its independent distributors had insufficient incentive to pursue on their own. The new uniform distributor contract it rolled out in 2008 and 2009, explicitly recognized Kaeser's right to make direct sales of its products "through branch offices, employee salespeople, manufacturer's representatives, and through catalog or the Internet to end-users and Original Equipment Manufacturers (OEMs) in [an independent distributor's] Territory when [Kaeser] reasonably determines that such an approach is appropriate . . . ." (Ex. 70, Pt. II.)

CPR and Jim Kinate saw Kaeser's movement toward what it called "dual distribution" as the "kiss of death" for its independent distributors. In Kinate's view, Kaeser was trying to steal the fruits of his labor and investment of more than twenty years promoting and selling Kaeser compressors and servicing his customers. Notwithstanding Kaeser's assurances that it had no interest in putting a branch office in CPR's territory to sell to existing customers and that it would only seek business CPR was not interested in pursuing, Kinate was convinced that Kaeser would use its ability to undersell CPR on any transaction to not only take new business CPR might otherwise acquire but eventually take away CPR's existing customers as well. CPR viewed any move to dual distribution in its territory as a serious breach of its original agreement and a violation of the WFDL.

There were other provisions of the new contract that Kinate and CPR also found objectionable. Whereas CPR's original contract required CPR to annually provide Kaeser with its financial statements upon completion of its fiscal year, the new contract called for annual audited financial statements, which CPR saw as unnecessarily adding to its costs. The new contract, unlike the old, contained an arbitration clause requiring that all disputes between the parties that they could not otherwise resolve were to be submitted for binding arbitration in Washington, D.C. The new

contract required CPR to "meet all sales goals specified in the yearly goal letter and sales history" as opposed to "strive to meet mutually agreed upon sales goals," as its original contract had stated. Also of particular concern to Kinate was a provision that provided that the agreement would automatically terminate in the event of a change in ownership, control or legal status of the distributor and gave Kaeser "unfettered discretion" in deciding whether to offer a new agreement to the new entity. Due to his age and health problems, Jim Kinate was in the process of handing over control of CPR to his daughter Martha Kinate Blaney, who had worked for the company since her early teens. Under the new contract, Kaeser would be able to terminate the dealership upon completion of the transfer.

Kaeser formally tendered the new contract to Jim Kinate on April 21, 2009, informing him that he had twenty days to return a signed copy. Kinate refused to sign the new contract but expressed a willingness to negotiate with Kaeser over the terms. Kaeser indicated, however, that it could not vary the terms of the contract, since it was intended to be a uniform agreement that would govern its relations with all of its U.S. distributors. In Kaeser's view, fairness to its other independent distributors and administrative ease and necessity required that each distributor be governed by the same terms. Kaeser also noted that all of its other independent distributors had signed the new contract, and no exception could be made for CPR. When CPR persisted in its refusal to sign, Kaeser commenced this action.

## VI. Good Cause

Kaeser seeks a determination by the Court that CPR's refusal to sign its new uniform contract for its independent distributors constitutes good cause for termination of the dealership within the meaning of the WFDL. The WFDL defines "good cause," as applicable here, as follows:

> Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.

Wis. Stat. § 135.02(4)(a).

The Court discussed the meaning of good cause extensively in its decision denying Kaeser's motion for summary judgment and will not repeat that entire discussion here other than to note that although the statute requires new requirements imposed by a grantor to be both essential and reasonable, courts have noted that these terms "are closely related and were clearly intended to be read together." *Deutchland Enterprises, Ltd. v. Burger King Corp.,* 957 F.2d 449, 452 (7th Cir. 1992). In other words, a court need not determine whether each requirement imposed by a grantor is both "essential" and "reasonable;" it must instead analyze good cause as a whole. As the Seventh Circuit has put it, "the grantor must therefore show three things in order to justify its proposed change: (1) an objectively ascertainable need for change, (2) a proportionate response to that need, and (3) a nondiscriminatory action." *Morley-Murphy Co. v. Zenith Electronics Corp.,* 142 F.3d 373, 378 (7th Cir. 1998). Moreover, in order to demonstrate an objective need for a change, a grantor need not show that the change is necessary for the grantor's very survival as a business. It is enough if Kaeser proves that the proposed contract was a nondiscriminatory and proportionate means of allowing the company to stay competitive in its market. *Ziegler Co. v. Rexnord, Inc. (Ziegler II),* 147 Wis. 2d 308, 319, 433 N.W.2d 8 (1988) (citing *Remus v. Amoco Oil Co.*, 611 F. Supp. 885, 887 (E.D. Wis.1985), *aff'd* 794 F.2d 1238 (7th Cir.1986)).

## VI. CPR's Refusal To Sign The New Contract Is Not Good Cause

Kaeser failed to establish by a preponderance of the evidence that CPR's refusal to sign the new distributorship contract constitutes good cause for termination of its dealership. It failed to show an objectively ascertainable need for the significant changes in the arrangement that the contract would have allowed and, thus, that its insistence that CPR sign was a proportionate response to its needs. Although the conditions Kaeser sought to impose on CPR were essentially the same as those it imposed on other distributors, this fact is entitled to little weight since its relationship with its other distributors was not subject to the WFDL and there is no evidence of what the terms of its previous contracts with the other distributers were. It is therefore at least questionable whether the other distributers could be considered "similarly situated." Wis. Stat. § 135.02(4)(a).

Relying on *Moodie v. School Book Fairs, Inc.,* 889 F.2d 739 (7th Cir. 1989), Kaeser places great emphasis upon the fact that the conditions it sought to impose on CPR are uniform and identical to the conditions it imposed on its other independent distributors. In *Moodie* the Court held that a dealer's failure to sign a lease for a computer that would allow him to come "on-line" with the grantor's computer system constituted a failure to comply substantially with reasonable requirements. In upholding the grantor's right to terminate the dealership in the face of the dealer's adamant refusal to sign the agreement, the *Moodie* Court observed: "A company is entitled to maintain uniform contract terms with its many dealers." 889 F.2d at 746.

Of course, the contract the dealer refused to sign in *Moodie* was an ancillary agreement that would not have changed the essential character of the dealership. Neither *Moodie*, nor any other case Kaeser cites stands for the proposition that a dealer must accept any and all uniform changes

to the dealership contract. *See Ziegler* II, 147 Wis. 2d at 319 (noting that "[i]n *Remus v. Amoco Oil Co.*, 794 F.2d 1238 (7th Cir.1986), the Seventh Circuit Court of Appeals condoned the grantor's unilateral and system-wide change of *minor* terms of the franchise agreement) (italics added). Here, by contrast, Kaeser was seeking to take away CPR's exclusivity, a key component of its agreement, even if a disputed one. The contract Kaeser insisted CPR sign is far different than that computer lease that the dealer in *Moodie* rejected.

While its desire for a uniform contract is understandable, Kaeser offered little evidence to support its claim that uniformity is essential or even important to its overall operation. Kaeser admitted that up until now, its distributer contracts have not been uniform, but offered no substantial evidence of significant problems that the lack of uniformity had caused. It offered testimony from several current distributors that they would be upset if they found out that CPR got a better deal than they did. But while Kaeser cites a desire to treat each of its distributors in a fair and consistent manner, the evidence demonstrated that before it insisted on a uniform new contract, none of the distributors knew the terms of the contracts Kaeser had with other distributors. Given the fact that each of the distributors became a Kaeser distributor at different times under different conditions for different territories having different advantages and disadvantages and brought different pluses and minuses to the table, it presumably would not have surprised many to know their agreements were not the same. Since they were not competing against each other at the time, however, it apparently was not a problem.

Moreover, even assuming complete uniformity is important, a grantor's desire for uniformity cannot trump the additional requirement that the changes in the agreement sought by the grantor must be essential and reasonable. Otherwise a manufacturer could impose draconian (but uniform)

new terms on its dealers (or effect a uniform "blanket termination") and simply cite a generic need for uniformity to justify the changes. The very fact that the WFDL exists is necessarily an obstacle to complete uniformity in contracts governing dealerships located in different states. The applicability of the WFDL to CPR's dealership also substantially reduces the force of Kaeser's evidence that all of its other independent distributors signed onto the new contract. Absent the protection of the WFDL, CPR would in all likelihood have signed on as well. The issue is not whether Kaeser's distributors can survive under the new contract; the issue is whether the significant changes Kaeser is demanding are essential and reasonable to Kaesar's profitability.

In fact, even though Kaeser has framed the issue in terms of whether CPR's refusal to sign the new contract constitutes good cause, the real issue is whether Kaeser has good cause to change the competitive circumstances of the dealership. For that is in essence what Kaeser's new contract would do. It would expressly permit Kaeser to place a branch office in CPR's territory and directly compete with CPR for sales. In claiming good cause exists for such a change in its distributor contracts, Kaeser points not to CPR's conduct so much as its own needs and desires. Indeed, notwithstanding Kaeser's dispute with CPR over its business plan and additional sales personnel, Kaeser conceded from the very beginning that CPR was an excellent distributor of its products, one of its best. It is its own desire for growth in the market beyond what it has already achieved upon which Kaeser bases its demand for a new distributorship arrangement.

By its terms, the WFDL does not contemplate changes in the dealership arrangement based on the grantor's economic interests. The grantor is not allowed to "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause," Wis. Stat. § 135.03, and the definition of good cause, as set out above, focuses on the

conduct of the dealer, not the grantor. In *Ziegler II*, however, the Wisconsin Supreme Court construed the requirement of "good cause" in § 135.02(4) to cover at least some cases in which the grantor's economic circumstances impelled the proposed change:

> The good cause element may be met if a dealer lacks substantial compliance with the terms of the new contract, provided the altered terms are essential, reasonable and nondiscriminatory. If the grantor is demonstrably losing substantial amounts of money under the relationship, it may constitute good cause for changes in the contract.

147 Wis. 2d at 315. Still, while *Ziegler II* broadened the definition of good cause to include the grantor's economic circumstances, it did not give grantors a license to terminate dealerships simply because they found they could make more money without them. "The Wisconsin Supreme Court was careful to limit this kind of grantor-based good cause, so that grantors would not be able to terminate merely upon a showing that they believed they could make more money without the particular dealer." *Morley-Murphy Co.*, 142 F.3d at 377.

In both *Ziegler II* and *Morley-Murphy*, the grantors were facing substantial losses when they sought to radically alter or terminate the dealerships. Kaeser has made no such showing here. Although testimony from Kaeser's president and secretary suggests the changes are needed for its profitability to increase, the parties stipulated that Kaeser has been profitable over the last ten years. (Dkt. 100, Stip. of Facts, ¶ 27.) Kaeser offered no evidence that would support Mueller's statement that its new uniform distributor contract was essential to its continued growth and profitability. There were no financial projections showing anticipated growth if CPR signed the new agreement verses lack of growth or even loss if it did not. Although Kaeser introduced evidence that showed significant sales growth in the Los Angeles and New England territories where it had branch locations, along with independent distributors, Kaeser's attempt to transfer its experience in those

territories to CPR's was unpersuasive, given the substantial differences in the populations and industrial capacities of the different areas. Indeed, Kaeser indicated it had no plans to introduce a branch office in CPR's district; it was seeking only CPR's acknowledgment that it had the right to do so if it deemed such an approach appropriate. In other words, Kaeser essentially conceded it had no current need to take away CPR's exclusivity within its district. This fact alone would seem to defeat Kaeser's argument over good cause. CPR's refusal to sign a new contract recognizing Kaeser's right to take action it conceded was not needed falls far short of showing good cause for termination.

Perhaps Kaeser's most curious argument was that because CPR has the protection of the WFDL the terms of the contract do not really matter. Kaeser assured CPR it had no interest in competing with CPR for the same customers and would not offer its products at lower prices in an attempt to take over its business, even though its new contract would give Kaeser the right to do just that. But if it did attempt to use its newly recognized rights to drive CPR out of business, Kaeser argued, CPR would be able to seek relief under the WFDL. For example, if Kaeser exercised its new contractual power to open up its own dealership across the street from CPR, CPR would be able to invoke the WFDL's protections against constructive termination. *Remus v. Amoco Oil Co.,* 794 F.2d 1238, 1241 (7th Cir. 1986). Thus, the WFDL's protections will mute Kaeser's ability to compete directly against CPR, and in considering the reasonableness of the proposed contractual terms, Kaeser argues, a court must consider not just the terms themselves but how those terms could be muted by the WFDL.

Kaeser's argument fails for at least two reasons. First, it runs directly counter to the argument Kaeser made in its brief seeking dismissal of CPR's counterclaim under the WFDL. In

its counterclaim, CPR had repeatedly alleged that by providing for direct Internet sales, Kaeser had "substantially changed CPR's competitive circumstances." (Counterclaim, ¶¶ 39, 45, and 52.) In support of its motion to dismiss CPR's counterclaim, Kaeser denied that the contract between the parties prohibited Kaeser from making such sales and argued that in the absence of such a provision in its contract, CPR had no such claim. "CPR's competitive circumstances – that is, the de facto situation of the dealer itself – are irrelevant to a § 135.03 claim", Kaeser argued. "All that matters is the contractual competitive rights created by the dealership agreement." (Br. in Supp. of Mot. to Dismiss, at 2-3.) Kaeser continued: "it is black-letter law that a supplier does not violate § 135.03 by subjecting a dealer to intra-brand competition, even if the dealer had not faced such competition before, as long as that competition does not infringe a right to exclusivity prescribed by the dealership agreement." (*Id.* at 3 citing *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 146 Wis. 2d 568, 574-77, 431 N.W.2d 721, 724-25 (Ct. App.), review denied, 147 Wis. 2d 888, 436 N.W.2d 29 (1988)). If, as Kaeser argued in its motion to dismiss CPR's counterclaim, it is the contract between the parties that determines whether the grantor can take actions that substantially change the dealer's competitive circumstances, and Kaeser cited several decisions that support its argument, then CPR is fully justified in refusing to sign a new contract that explicitly allows Kaeser to compete with it.

Kaeser's argument also fails, however, even if its more recently expressed view of the law – that the WFDL trumps the parties contract – is correct. This view, too, has some support in the cases, as well as the WFDL itself. *See* Wis. Stat. § 135.025(3) ("The effect of this chapter may not be varied by contract or agreement. Any contract or agreement purporting to do so is void and unenforceable to that extent only."); *see also Jungbluth v. Hometown, Inc.*, 201 Wis.2d 320, 548

N.W.2d 519 (1996) (holding that conduct by grantor that substantially changes competitive circumstances requires notice even though expressly authorized by contract). As Kaeser would apparently concede, the law is less than clear on the issue, making CPR's reluctance to sign entirely reasonable. But even if it was clear under the law that CPR would not be forfeiting its rights under the WFDL by signing the new contract, its refusal to do so still would not constitute good cause. For in that event, Kaeser would have nothing to gain from CPR signing. There is nothing essential and reasonable about requiring a dealer to sign an agreement that the grantor concedes is not enforceable by its terms against the dealer in any event. For all of these reasons, CPR's refusal to sign Kaeser's new distributor contract does not constitute good cause for termination of its dealership.

## ORDER FOR JUDGMENT

Based on the Court's previous order partially granting Kaeser's motion for summary judgment, the jury's verdict, and the Court's findings of fact and conclusions of law, the Court makes the following declarations:

1. The agreement between Defendant Compressor & Pump Repair Services, Inc. ("CPR"), and Kaeser Compressors, Inc. ("Kaeser"), constitutes a dealership within the meaning of the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135.01 et seq.

2. CPR's refusal to sign Kaeser's new distributor contract does not constitute good cause to terminate the dealership within the meaning of the WFDL.

3. The WFDL does not apply to the Minnesota portion of CPR's territory.

The Clerk is directed to enter judgment accordingly, with statutory costs to CPR.

**SO ORDERED** this _____18th_____ day of May, 2011.

                               s/ William C. Griesbach\
                               William C. Griesbach\
                               United States District Judge